**UNITED STATES BANKRUPTCY COURT FOR
THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | |
|---|---|
| In re: <br><br> **ORECK CORPORATION, *ET AL*.,** <br><br> Debtors.[1] | Chapter 11 <br><br> Case No. 13-04006 <br><br> Judge Lundin <br> (Jointly Administered) |

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
OBJECTION TO THE MOTION BY DEBTORS PURSUANT TO
U.S.C. §§ 363(B), (F), (K), AND (M), AND 365 AND FED. R. BANKR. P.
2002, 6004, TO (I) APPROVE (A) THE SALE TRANSACTION PURSUANT
TO THE ASSET PURCHASE AGREEMENT WITH ORECK ACQUISITION
HOLDING LLC, FREE AND CLEAR OF CLAIMS, LIENS, ENCUMBRANCES,
AND OTHER INTERESTS; (B) THE ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND
(III) (A) ESTABLISH SALE AND BIDDING PROCEDURES**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the bankruptcy cases of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through its undersigned proposed counsel, hereby submits this objection (the "Objection") to the *Motion By Debtors Pursuant to U.S.C. §§ 363(B), (F), (K), and (M), and 365 and Fed. R. Bankr. P. 2002, 6004, to (I) Approve (A) The Sale Transaction Pursuant To The Asset Purchase Agreement with Oreck Acquisition Holding LLC, Free and Clear of Claims, Liens, Encumbrances, and Other Interests; (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (III) (A) Establish Sale And Bidding*

---

[1] The Debtors are as follows: Oreck Corporation, ASP Oreck, Inc., Oreck Direct, LLC, Oreck Merchandising, LLC, Oreck HomeCare, LLC, Vecteur, LLC, Oreck Holdings, LLC, Oreck Manufacturing Company, and Oreck Sales, LLC.

*Procedures; and (B) Schedule a Sale Approval Hearing* [Docket No. 93] (the "Sale Motion").[2] In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1. The Sale Motion seeks entry of a sales procedure order approving certain proposed procedures to govern the proposed sale process, as well as the entry of an order approving the sale of substantially all of the Debtors' assets pursuant to a certain Asset Purchase Agreement dated May 15, 2013 ("Stalking Horse APA") between the Debtors and an insider purchaser. By the Sale Motion, the Debtors seek authorization to put into process a wholesale transfer of their assets while evading much of the disclosure, solicitation, voting and other requirements for confirmation of a plan, plus the other protections for creditors that should be required to effectuate such a sale as part of a chapter 11 plan process. The Debtors' decision to proceed with a quick section 363 sale to an insider in these cases, rather than a plan process, may subject the Debtors' estates to risk of administrative insolvency, and requires vigilance to avoid a misuse of section 363 of the Bankruptcy Code and the bankruptcy process.

2. Pre-confirmation sales of substantially all of a debtor's assets require, at the very least, a demonstration by the debtor that an expedited sale is necessary to preserve or enhance the value of its estate. Here, the Debtors have offered no good business reason or justification for the proposed quick sale outside of a plan, without full disclosure of their assets and liabilities, and a robust opportunity for non-insiders to participate fully in the sale process. The "urgency" simply appears to be the purchaser's desire for a quick sale.

3. The Debtors have not submitted proofs that their business is a "melting ice cube," that the Debtors' assets are wasting, or that the Debtors are hemorrhaging money. Nor has the Committee had an opportunity to test such assertions if made by the Debtors. The

---

[2] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to such terms in the Sale Motion.

Debtors appear to have access to sufficient liquidity to operate through confirmation of a plan or, at a minimum, a time period sufficient to permit their assets to be fully exposed to the market.

4. While there may be benefits to the Debtors' estates from the proposed sale, the benefits and the opportunity to sell the Debtors' assets would still exist under a chapter 11 plan or following a more robust sale process.

5. In addition to the unreasonably truncated timeframe in which the Debtors propose to run the auction sale process, there are numerous other issues with the proposed Stalking Horse APA and Bidding Procedures that need to be addressed (which are set forth in detail below), including the uncertainty around the assumed contracts and other liabilities, the claims created by the transaction and left with the estates and whether the waterfall of payments to be made from the cash portion of the purchase price reaches unsecured creditors, to the extent those claims are not "cured' or assumed.

6. There is simply no good reason to rush the sale process in these cases. If the Debtors truly intend to test the market in an effort to maximize value for their estates and creditors, the timeframe from approval of the Bidding Procedures required under section 5.2 of the Stalking Horse APA should be extended.

**GENERAL BACKGROUND**

7. On May 6, 2013 (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").

8. Since the Petition Date, the Debtors continue to operate their businesses and managed their properties as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108. No Examiner has been appointed in the Debtors' bankruptcy cases.

9. On May 16, 2013, the Office of the United States Trustee appointed the Committee pursuant to 11 U.S.C. § 1102. [ECF Doc. No. 103].

10. On May 17, 2013, the Committee selected Lowenstein Sandler LLP to serve as its counsel.

11. On May 16, 2013, the Debtors filed the Sale Motion, through which they propose to sell "substantially all of the Debtors' assets, including all of the equity interests of their directly-held subsidiaries and joint ventures (other than excluded entities)" (Sale Motion at ¶ 6), pursuant to the Stalking Horse APA dated May 15, 2013 between the sellers and an entity called Oreck Acquisition Holdings LLC (the "Stalking Horse Bidder") or a different successful bidder. The principal of the Stalking Horse Bidder maintains an ownership interest in the Debtors, including approximately 16 of its retail stores. (Sale Motion at ¶ 22, n. 4).

12. In connection with the Sale Motion, the Debtors seek the entry of a sales procedure order approving certain proposed procedures to govern the proposed sale process (the "Sale Procedures Order"), as well as the entry of an order approving the sale of substantially all of the Debtors' assets pursuant to the Stalking Horse APA to the Stalking Horse Bidder. The Committee objects to the entry of the Sale Procedures Order and approval of the Stalking Horse APA as currently proposed.

## JURISDICTION AND VENUE

13. The Court has jurisdiction over this Objection pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE OBJECTIONS

**The Proposed Sale is Subject to Heightened Scrutiny**
**Because the Proposed Purchaser is an Insider**

14. Section 101(31)(E) of the Bankruptcy Code defines "insider" as an "affiliate or insider of an affiliate [of the debtor] as if such affiliate were the debtor." 11 U.S.C. § 101(31)(E). The proposed Sale to the Stalking Horse Bidder, the principal of which maintains an ownership in the Debtors, including approximately 16 of its retail stores, is therefore an insider

transaction.

15. Transactions with insiders must withstand a heightened level of scrutiny and be entirely fair before they can be approved under section 363(b). *See, e.g., In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010) (noting that transactions involving insiders are subject to the "heightened scrutiny/entire fairness standard" before they can be approved); *Crown Vill. Farm, LLC v. Arl, L.L.C. (In re Crown Vill. Farm, LLC)*, 415 B.R. 86, 93 (Bankr. D. Del. 2009) (holding that "[t]he sale process will be under the close scrutiny of the Court as required where the stalking horse is an insider"); *Official Comm. of Unsecured Creditors of Enron Corp. v. Enron Corp. (In re Enron Corp.)*, 335 B.R. 22, 28 (S.D.N.Y. 2005) (transactions that benefit insiders must withstand heightened scrutiny before they can be approved under section 363(b)); *In re Firstmark Corp.*, 46 F.3d 653, 656 (7th Cir. 1995) ("sale of a debtor's property to an insider is subject to close scrutiny"); *In re Ozark Restaurant Equipment Co., Inc.*, 850 F.2d 342, 345 (8th Cir. 1988) (sales arranged by insiders must be given close scrutiny). A heightened level of scrutiny is necessary because transactions with insiders are rife with the possibility of abuse. *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997); *In re LWD, Inc.*, 332 B.R. 543, 555 (Bankr. W.D. Ky. 2005) ("Thus, the question is one of substantial fairness, whether Debtors disclosed the asset in a manner sufficient to allow potential bidders to value it properly and bid for it on a footing equal to that of the insider Defendant. As Plaintiff correctly notes, 'sales to fiduciaries are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse'") citing *In re Wingspread Corp.*, 92 B.R. 87 (Bankr.S.D.N.Y.1988).

16. Insider transactions cannot be approved unless they are the product of an "arm's length bargain" in "good faith" with "inherent fairness" from the viewpoint of interested parties. *Pepper v. Litton*, 308 U.S. 295, 306-07 (1939). When asset sales benefit insiders, the purchaser of the assets "has a heightened responsibility to show that the sale is proposed in good

faith and for fair value." *In re Med. Software Solutions*, 286 B.R. 431, 445 (Bankr. D. Utah 2002). *See also Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813, 823 (W.D. Pa. 1997), *aff'd*, 160 F.3d 982 (3d Cir. 1998) ("[I]nsider transactions are subjected to rigorous scrutiny and, when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation and those with interests therein.").

17. In the present case, because the Stalking Horse Bidder is an insider and has the ability to influence, and likely has already influenced, the sale process, the Court must evaluate the proposed Bidding Procedures and Sale Transaction under heightened scrutiny. The Committee respectfully submits that the Bidding Procedures and proposed Stalking Horse APA as currently proposed fall short of the requisite "entire fairness" standard and should not be approved.

18. A section 363 sale can be approved if the court is satisfied that the debtor has exercised sound business judgment; provided adequate notice; the purchaser has proceeded in good faith; and the purchase price is fair. *In re Barnhill's Buffett*, 2008 Bankr. Lexis 2864, *7 (Bankr. M.D. Tenn. February 28, 2008).

19. The "sound business purpose test" commonly considers four factors:

(i) a sound business reason or emergency justifies a pre-confirmation sale;
(ii) adequate and reasonable notice of the sale was provided to interested parties;
(iii) the sale has been proposed in good faith; and
(iv) the price is fair and reasonable.

*In re Barnhill's Buffett,* 2008 Bankr. Lexis 2864, *7 (*citing In re Titus Country Club,* 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *see also In re Crawford*, 2010 WL 4975644 (M.D. Tenn. 2010). Consideration of these factors should result in the denial of the Sale Motion. Moreover, "it is possible that a Chapter 11 debtor could satisfy all the elements required by *Stephens*

*Industries, Inc. v. McClung*, 789 F.2d 386 (6th Cir.1986), to permit a pre-confirmation sale of substantially all of its assets pursuant to Section 363(b)(1) yet still not be able to secure approval of that sale because of the objecting creditor's right to fair and equitable treatment under Section 1129(b)." *In re Dalen*, 259 B.R. 586, 601 (Bankr. W.D. Mich. 2001).

20. Accordingly, the Sale Motion should be denied or the Stalking Horse APA otherwise modified for the following reasons.

**The Debtors' Assets And Liabilities, Including Those**
**Being Acquired Or Assumed, Are Not Fully Disclosed**

21. Despite having not yet filed any statements of financial affairs or schedules of assets and liabilities, the Sale Motion proposes to sell "substantially all of Debtors' assets, including substantially all of the equity interests of their directly-held subsidiaries" and joint ventures, for the amount asserted as $21,882,000 under the Stalking Horse APA. It is unclear exactly what is being purchased and assumed and whether the transaction fairly values the assets to be sold.

22. The Stalking Horse APA provides for the sale of certain intellectual property but fails to identify them in section 1.1(d).

23. The Stalking Horse APA also provides for the sale of chapter 5 claims. No information is provided with respect to the value of such claims. Nor is information provided with respect to what the purchaser proposes to do with such claims. Under the circumstances, the chapter 5 claims, including those against the insiders, should remain with the Debtors' estates.

24. The Debtors indicate that they are selling "Other Assets" as set forth on schedule 1.1(1), but the Stalking Horse APA indicates that the list is not exhaustive. Everything being sold should be disclosed as part of the list.

-7-
Case 3:13-bk-04006    Doc 145    Filed 05/20/13    Entered 05/20/13 16:25:48    Desc Main
Document      Page 7 of 14

25. The Debtors also indicate that they are selling causes of action in section 1.1 (h), but do not list those causes of action. To the extent these causes of action are not simply related to reconciling account receivable disputes and related to acquired accounts receivable, the causes of action should be fully disclosed, and if not essential to the business operations being sold, should remain with the Debtors' estates for the benefit of unsecured creditors.

26. Furthermore, section 1.1(m) references the sale of the tail insurance. The Stalking Horse APA, however, does not state what protection the Debtors would have in the event that claims are asserted against the Debtors post-closing with respect to goods sold by the Debtors pre-closing. The insurance should not be included in any sale until it is determined that its inclusion in the sale will not leave the Debtors exposed to unknown liability.

27. Section 101(n) of the Stalking Horse APA provides that the assets of Oreck China are being sold, but *only* if the Stalking Horse Bidder wants to acquire them. If the Stalking Horse Bidder decides not to take these (or any other) assets under the Stalking Horse APA, it should be clear what would then occur with respect to these assets. For example, would their future disposition create additional liabilities for the estates? Alternatively, if those assets have value, is it the intent of the Debtors to abandon the assets to the Pre-petition Lenders? The Pre-petition Lenders may not have valid liens on assets in China, particularly since the lenders may only have liens on at most 65% of the equity of the Chinese entity, or may not have advanced against assets located in China. Not including the Chinese assets in the proposed sale may result in a devaluation of the Chinese assets in a future sale.

28. Section 101(j) of the Stalking Horse APA implies that the Debtors can elect to sell any assets prior to the sale to under the Stalking Horse APA. Thus, it appears that the Debtors can sell assets subject to the Stalking Horse APA prior to the proposed sale pursuant to that APA. Has the Purchaser agreed to a sale of assets pre-auction for which it has contracted?

29. Section 1.4 of the Stalking Horse APA limits the Stalking Horse Bidder's responsibility to pay cure claims. It appears that the Stalking Horse Bidder agrees to pay the first $500,000 and only half of the next $1 million of cure costs, but it is unclear how the balance of any cure claims would be paid. Presumably, the Debtors' estate would pay such sums. Further, although further disclosure is required, it appears that the contract cure claims could easily exceed $500,000, and likely $1.5 million. At best, the total amount of the projected cure amounts under the Stalking Horse APA for assumed contracts remains unclear. From the Committee's perspective, assuming contracts and paying cure is beneficial for the unsecured creditor body in that it limits the "left behind" creditor claims. However, clarity regarding this issue is important.

30. The Committee notes that the Stalking Horse APA, at the end of section 1.4(a), states that the purchase price is reduced dollar for dollar when cure costs exceed $1,500,000. To the extent that unsecured debt is assumed through cure payments under the Stalking Horse APA and through a critical vendor treatment program, then purchase price adjustments are less important. If the lion's share of unsecured creditors' claims are not part of the obligations being assumed under the Stalking Horse APA, however, but rather true "victim creditors," then the waterfall, whether cash remains available for unsecured creditors, and when and how it gets distributed post-closing, becomes more important.

31. The Committee should see a list of the cure amounts that the Debtors believe exist so that the Committee can determine if the purchase price will be subject to adjustments much greater than $1,500,000, and if so, the extent of the unsecured creditor body not being treated as an assumed contract party or critical vendor.

32. Further, the Stalking Horse APA provides that if there is a dispute with regard to cure, the Stalking Horse Bidder can decide to simply drop the contract, before or after the sale hearing. If the Stalking Horse Bidder decides to take a contract, the cure issues should

-9-
Case 3:13-bk-04006    Doc 145    Filed 05/20/13    Entered 05/20/13 16:25:48    Desc Main
Document    Page 9 of 14

be resolved at the auction because assumed liabilities and the elimination of dilutive rejection damage claims is an important component of the value in determining whether an alternative bid is higher or better.

33. In the Stalking Horse APA at section 1.4(c), the purchase price floor of $14,500,000 is substantially less than the stated value of the proposed sale transaction - $21,882,000. Consequently, the Committee needs an opportunity to vet the other components of this estimated purchase price. It appears that the "net" sale price may be about two-thirds of the stated sale price.

34. The Sale Motion should include a waterfall analysis in order enable a determination of what cash should be left over, if any, for distribution to creditors whose claims are not "cured" or assumed and, importantly, to determine if the Debtors have the requisite cash needed to close.

35. Under section 1.4 of the Stalking Horse APA, the basis on which the Debtors believe that warranty claims will not exceed the $3,800,000 cap, or if coupons may exceed the $300,000 cap, is unclear. The Stalking Horse APA and Sale Motion are silent as to what happens if those amounts are exceeded pre-closing and/or post-closing.

36. The Stalking Horse APA in section 1.1(a) includes the sale of real estate but does not disclose whether there are mortgages on the property or whether it has been recently appraised. It is unclear whether this asset should be creating value for unsecured creditors.

37. In the Stalking Horse APA at section 1.6, the Stalking Horse Bidder has 30 days after closing to allocate the purchase price. But, the Stalking Horse Bidder may have very different considerations than the Debtors or the Committee when it comes to allocation of the purchase price. For example, 35% of the equity in foreign entities is not subject to the Pre-petition Lenders' liens as of the Petition Date. And, assets in foreign jurisdictions may not be subject to the liens of the lenders. Furthermore, the Debtors and the Committee may have very

-10-

different tax considerations than the Purchaser.

38. The Committee would similarly look closely at a valuation that shifted tax claims to the Debtors' estates as opposed to assuming those claims or allocating value to protect the estates from tax exposure. Under the Stalking Horse APA, as section 3.11 confirms, the Purchaser is not paying the Debtors' taxes. The tax obligations need to be disclosed in order to determine the tax implications of the purchase price allocation and to calculate the waterfall.

39. At a minimum, the allocation should be subject to the non-objection of the Committee, and if the Committee objects, then the allocation should be subject to Court approval.

40. Furthermore, section 3.10 (c) of the Stalking Horse APA should be considered in light of WARN Act liabilities and other triggered employee claims. If the Debtors commenced their cases with the Stalking Horse APA in place, they should have issued an appropriate protective WARN Act notice to their employees to avoid WARN Act liabilities or similar state law triggers. If those notices were not sent prepetition, they should be sent immediately and the sale closing should wait for the applicable notice periods to expire. Section 7.2 of the Stalking Horse APA makes the Debtors' estates liable for WARN Act liabilities. These liabilities should be assumed. Employee issues are particularly important to the Committee as Stalking Horse APA section 7.2 (b) states that the Stalking Horse Bidder is *not* required to hire active employees. This potentially dilutes the creditor claim pool with employee claims and potentially creates administrative expenses and priority claims which will not be disclosed until *after* the auction. The Stalking Horse Bidder may not know exactly which employees it intends to hire, but disclosure here is important to calculate the waterfall and, if there are other bids, to determine which bids provide more value.

41. The Stalking Horse APA at section 5.1 provides that the obligation to get a sale procedures motion on for a hearing within five days' notice is only a "best efforts"

-11-
Case 3:13-bk-04006   Doc 145   Filed 05/20/13   Entered 05/20/13 16:25:48   Desc Main
Document      Page 11 of 14

requirement. So, adjourning this insider sale procedures hearing and the sale process to allow the Debtors to file their schedules of assets and liabilities and statements of financial affairs and to give other parties more time to diligence the assets should not cause a default.

42. Moreover, since the Stalking Horse Bidder is an insider, giving non-insider bidders real information and a realistic opportunity to diligence the assets not only prevents chilling of the sale process, but bolsters its integrity.

43. The breakup fee is excessive. As an insider, the Stalking Horse Bidder should not be entitled to a break-up fee. However, should the Court permit an insider break-up fee, it should be tied to and limited solely to reimbursement of actual expenses. And, the amount of the breakup fee should only be paid after the Committee has an opportunity to review the request. And, if there is a dispute, after the matter has been considered by the Court.

44. Furthermore, it appears that section 5.5 of the Stalking Horse APA refers to the breakup fee and the expense reimbursement as having a "carve-out." It is unclear why a breakup fee to an insider would come ahead of other chapter 11 administrative expenses. But regardless, it should only be paid as a carve-out from the actual sale proceeds from an alternate closing. It should not come ahead of unsecured creditors if there is no closing and the sale process fails.

45. In Stalking Horse APA, at section 6.1(l), it appears that the inventory and current receivables have to be at least $20,000,000. First, it is unclear whether this number is reasonable without filed schedules of assets and liabilities. Second, it is more common in a bankruptcy section 363 sale setting to provide for a purchase price adjustment if the inventory number is less. A right to walk away without penalty prejudices the Debtors' estates and gives undue leverage to a purchaser to renegotiate the sale agreement after other bidders have been told they are out of the process and the auction and sale hearing have passed.

46. Accordingly, for the foregoing reasons, the Committee respectfully requests that the Court (i) deny approval of the Sale Motion unless the concerns and objections of the Committee set forth herein are addressed; and (ii) grant the Committee such other and further relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Daniel H. Puryear*
Daniel H. Puryear; No. 18190
Maximilian R. Loosen; No. 27388
Puryear Law Group
102 Woodmont Boulevard
Woodmont Centre, Suite 520
Nashville, TN 37205
(615) 630-6601 – Telephone
(615) 630-6602 – Facsimile
dpuryear@puryearlawgroup.com
mloosen@puryearlawgroup.com

and

**LOWENSTEIN SANDLER LLP**

*/s/ Sharon L. Levine*
Sharon L. Levine, Esq.
Kenneth A. Rosen
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)
slevine@lowenstein.com
krosen@lowenstein.com

*Proposed Counsel for the Official Committee of Unsecured Creditors*

## CERTIFICATE OF SERVICE

      I hereby certify that a true and correct copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to those parties specifically requesting electronic service. The following parties will be served via first class, U.S. Mail, postage prepaid:

William L. Norton, III
Bradley Arant Boult Cummings, LLP
1600 Division Street, Suite 700
Nashville, TN 37203

United States Trustee
318 Customs House
701 Broadway
Nashville, TN 37203

Beth R. Derrick
Assistant US Trustee
Office of United States Trustee
318 Customs House
701 Broadway
Nashville, TN 37203

on this the 20th day of May, 2013.

      The parties may access this filing through the Court's electronic filing system.

      */s/ Daniel H. Puryear*
      Daniel H. Puryear